Good afternoon and thank you for hearing us. David Weinstein for the appellant. Your honors, this is a case that presents a question about a very sharp disagreement as to what a bankruptcy trustee can do and can't do in the administration of a bankruptcy estate. The case is particularly important because it brings before you a very common situation on which there are surprisingly few decisions. And I dare say that this court's review and decision will, in the bankruptcy world, draw a fair amount of attention. I intend to demonstrate for you, in what I believe and hope will be a fairly concise and pointed way, that the trustee's actions in this case necessarily either contravene this court's existing precedent in Lazar, which we cite in the papers, it's 83 F. 3rd, 306, 1996 decision of this court, or the only other way to look at the situation is to conclude that the trustee in bankruptcy made what essentially amounts to an improper side deal. We have approached the case... Side deal with Comerica? With the bank, yes. The subject of that is what, $250,000? I'm sorry? The subject of that side deal is what, $250,000? The subject, in its narrowest configuration, is the $250,000. That was what the augmentation order fight was all about. Correct. Then let me ask you a question, because the blue brief says on page 28 that when push came to shove, I quote, W.W.O. finally admitted that the entire $250,000 would be paid to Comerica if the odd order was not entered. And then Ms. Weiss, I suppose that's one of your partners... Correct. ...says, well, I mean, if the existing order that's on appeal holds and the Ninth Circuit does not overturn it, notwithstanding your approval, yes, I guess you're correct, the money would go back to Comerica. Yes. The linchpin... If the augmentation order wasn't entered, you don't get a penny of that $250,000, right? Well, not quite. And I do believe... There were no unencumbered funds in this estate. That's correct. And that's what, Your Honor, that's what that reference was to. Whether Ms. Weiss misspoke a little bit or... Now wait a minute. Now all of a sudden Ms. Weiss misspoke a little bit. No, what I'm saying is the following. What I'm saying is the following. There's one way to look at this is there's some narrow temporal, not to draw on the court's prior case, but there's some narrow ethereal moment between when the bank authorizes what it can do, what can be done with the money, and the happening of that money where it hasn't happened yet. But what we're suggesting, what we're arguing here is, yes, the money was encumbered. No question about that. We don't challenge that. But the fact that it's... In favor of Comerica. Yes, in favor of Comerica. Yes, I certainly meant that. But the fact that it's encumbered does not... It does not follow from that, that the bank gets to say the only thing that gets to be done with it when it's property of the estate. And that's why I set up for Your Honor the dichotomy that either it's property of the estate, in which case Lazar and the bankruptcy code control what happens to it, or it's not property of the estate, it's, quote, the bank's money, in which case private money or private assets were necessarily used to make a deal and compensate the trustee. With all due respect, there's no other way to look at this because... Before you... Go on. I think we all have a problem. What do you get out of this if you win? Well, we... Yes, and I have notes on the remedy. What we get out of this is that the order that allocates... The aspect of the order that allocates the money to the trustee and the selected professionals is vacated. Now, what do you get? Well, we get some yet-to-be-computed proportionate share of at least the $250,000. Okay, you might be right, but I don't follow it. It would seem that it would go back to Comerica. No, because it's already been allocated to administrative expenses. That's the point. You think you can get a share of the $250,000? Yes, and to finish answering the question... This question here. Comerica had a lot of money put in this estate. Correct. Well, loans to the estate. And they put in another $20 million or $40 million? I believe the total, if I'm not mistaken, over a fairly extended period of time was in the range of $30 million, I believe. Yes, after it went into bankruptcy. Probably more than half was before that. A considerable portion was after that. I thought it was something like $20 million. All right, and all the funds, all the assets are encumbered, and Comerica's got that lien on all that money. Correct. Okay, so they're the only ones that stand to gain anything. So they loan the money because they want the trustee to administer the estate and get the thing going and straighten out, and they have enough faith that the trustee is going to be able to pay them back that fresh money, that $20 million, whatever the amount is, and to dispose of the other assets so their losses are minimal. So they need the trustee to be in there and administer this estate. Well, they run out of money. The trustee's not going to work for nothing. They want the trustee. Well, how much more do you need, trustee? Well, I think we need $250,000 more, whatever it was. Okay, we'll make that available to you. We'll see that you get paid that amount of money. So what's wrong with that? That is exactly what happened here, Your Honor. What's wrong with it? The problem with that is exactly the following. Trustees cannot make deals that differentiate among administrative expenses. The trustee's entitlement to be paid derives not from rendering services to a bank as some sort of... Who is going to pay the trustee? Well... The clients who are going to pay the trustee? No, of course not. Of course not. Of course not. But the trustee is a fiduciary of the highest magnitude. The trustee cannot make a deal that says... Well, what is the trustee supposed to do? Well, the trustee is supposed to, Your Honor, either turn away from a proposal to pay him privately or deal with the fact that whatever comes in, comes in for the common good of which he is simply one personal claimant. And there's an important and very critical reason for that. The trustee is bargaining with powers vested in him by the court. They are to be exercised, used, limited, however you want to look at it, for the common good. They are not to be used just to generate fees because there's a specific set of benefits... Where did the money come to pay the trustee initially? All of the money that went to the trustee came from money loaned to the bankruptcy estate. By the bank? Yes, but loaned to the bankruptcy estate, Your Honor, and Ben Franklin's store case written by Judge Barley. But those funds had a secured interest in the estate. They just didn't throw $20 million into the estate. Well, to be precise, money that is loaned is not per se encumbered. What happens, of course, when you parse a commercial transaction, money comes into the borrower, the borrower gives collateral in exchange to assure payment. So there must be limits. There must be limits because the trustee's entitlement to be paid derives from a single source. The Bankruptcy Code and Sections 326 and 327 are the only source of the trustee's entitlement to be paid. This Court has said quite properly and quite clearly that that is one of the administrative expenses, correctly, and all administrative expenses must be treated equally. The trustee cannot step outside... How would the trustee get paid here? The unencumbered were the creditors whose debts were not secured? Were they going to put the money in to pay the trustee? No. Well, it is certainly assumed for these purposes that that would not be the case. But, Your Honor, if the trustee can't be paid, and again, cases like Ben Franklin's store, Preston Lumber... The money initially to pay the trustee came from the proceeds of that secured loan, right? Yes, but let's back up a second. What's wrong with having a little bit more come to the trustee from that same store? That's exactly the point, Your Honor. There's a distinction being drawn here between to the trustee and to the estate. The loan funds all come to the estate to be administered and used for the estate's purposes, the bulk of which were the construction and assorted administrative matters. One function, one additional piece of which, is the payment of administrative expenses, including, but not limited to, fees to the individual who served as the trustee. And those fees are of equal rank with a number of things, including our firm's fees, and including the proverbial sparklets, water, insurance, and other things that are provided to the estate. And the trustee working for the estate to obtain loan funds cannot say, give us a separate river of money out of these loan funds to pay me on the side. That's what happened here. And it was disguised... What was the initial funds that were set aside to pay the trustee? Where'd they come from? They all came from the same source of loaned money to the estate. Okay, and then how did the trustee then get that money to get paid? If you're asking, in the intervening time, there were a series of fee orders that authorized the trustee to take the money physically, but we're not dealing with that here. We're dealing with the conceptual construct of how the money comes in and the underlying... What the trustee should have done then was go to the bankruptcy judge and present a request for fees. That happened in the intervening period. There were requests for approval of the fees, which essentially addresses whether work was done as reported, was the amount of time dedicated reasonable, and so on. Those intervening steps were done, but those are not part of this process. That's what should have been done here, you're saying. That was done, and it was proper as far as it went. My point is a different one. My point is that the fund of money from which those fees were paid were specially allocated at the beginning and augmented here only for those fees when the source of the entitlement for those fees is drawn strictly from the Bankruptcy Code's administrative expense provisions, which do not and cannot differentiate between those types of administrative expenses and others, namely our fees and other administrative operational expenses, and to have made a bargain to take this $250,000 out of estate funds that at least in theory the estate must pay back. Not the trustee, but the estate must pay back. Pay back to whom? To the bank. The bank loans the money. There was still $260,000 in there. At the point that this proceeding arose, that's correct. Encumbered. Correct. In favor of Comerica. Correct. Okay. I think just to go back a little bit, I'd really like to focus on the encumbering. The lender makes a check out and it's deposited to the trustee's account. To the estate's account, but yes, that's correct. Administered by the trustee. At what point is this? What security is there at that point? As I recall, the commercial documents obviously can be very complicated, but generally speaking there's an encumbrance on the real estate that was being developed. I believe there's an encumbrance on all of the materials being driven in. Surely you have these other physical items. Yes, and I believe, but I admit that I'm not certain, I believe there was probably a reference to an encumbrance on the bank account itself. I assume that that was the case. Well, I think there's some pertinence. It's not because of the following. And again, I must draw the court's attention to cases like Ben Franklin Storrs and Preston Lumber that have analyzed this question in the bankruptcy context. None of the others do. But to answer your honor, just because the money's encumbered does not mean that the encumbering entity gets to direct all of its uses when the directions violate the code. The directions given by the bank, and by the way, as an aside, there's no real evidence. So this deal is bad. It's off. Then the holder of the liens says, okay, I enforce my lien. You know what, that may be the case. And that actually describes the underlying tension. That tells the story of the case. That doesn't tell the narrow legal effect now. That tells the story of the case, and we discussed that in our papers. That tells exactly why the bank, well, as best we can infer, and I think it's pretty good in the educated guess realm, if you will, that tells the story as to why the bank wanted to do that. Because the bankruptcy code gives the secured lender several advantages and protections that it doesn't have in the non-bankruptcy commercial world of real estate transactions. And we elaborate on that, and that's elicited for you in cases like Ben Franklin Stores and Encore Health. So that tells the story as to why it happened. But there's got to be a limit, and this case brings before this court exactly that limit. Otherwise, what happened here will become the rule. It will become everywhere. These events occur almost every day. Interestingly enough, there are very few cases on the point because not that many people and not that many clients are in a position to stay with it as long as we have. But what happened here, and the focus is not on the bank. The focus is on the trustee. The trustee allowed the bank or blames the bank, if you will, and we don't really know exactly what the exchange was. But the trustee blames the bank but allowed it to hijack the estate and say, well, we want to pay you. Well, of course the trustee is going to say, well, as long as it's me. Now, by the trustee's own logic, the bank could have said, well, we want to pay Weinstein, and you'll be better off later because you'll get more money later if it ever shows up. What's the status of that lawsuit, by the way? To the best of my knowledge, it is lingering, relatively uneventful. One of those many lawsuits, if I may, that exist, at least in the bankruptcy courts and perhaps in other venues, someday could be called upon for settlement. Trustees Council probably could answer that better than I can, but I can say that the known record shows very little energy on that case, very little expectation I have intermittently outside of this record. The other side says, you know, if we're successful against Cooper, you might get your money. True enough, but that certainly isn't a justification for this legal construct. What do you want us to hold? With respect to the augmentation order, we're writing the opinion. What do you want us to hold with respect to the augmentation order? Well, I think there has to be a threshold decision, a threshold analysis as to whether it was property of the estate or not. I think, depending upon how that goes, you get the same result, a little bit different reasoning. Well, I think it was property of the estate. Well, I think it was, too, and I think Lazar says they can't do what the bank says. I don't want to hear about Lazar. Okay. Property of the estate, what do you want us to hold with respect to the augmentation order? That the augmentation order is reversed. Reversed. So that the provisions, that the money is available for all administrative expenses equal to. . . No, that's where I have trouble with you. It's reversed. So the augmentation order is gone. The $260,000 remains in the estate. It's encumbered in favor of Comerica, and they say, screw you, it's our money. It doesn't go for any administrative expenses at all. Well, I think. . . Don't they say that? They're not going to give it away for administrative expenses under those circumstances. Allow me to answer this way. I think that, and perhaps I was a bit. . . I don't want to say glib, but I was a bit too quick. Perhaps the correct response to your first question would be to vacate and remand for further proceedings with the following instructions. I believe that the case has gone sufficiently down the track that Comerica should actually be foreclosed under the circumstances from taking that position given everything that's happened. So you said it was to vacate the augmentation. And I do apologize for that. In which case, the money stays in the estate. But. . . Comerica says it's our money. Yes, but I. . . You don't get a penny. Well, Your Honor, I think that. . . Right, you don't get a penny. If Comerica is permitted to say that categorically, then I guess that would be the correct result. Right. But what this is about is our view, and I think this accurately tracks what occurred. Comerica released control of that money. To the extent it had any influence over control. . . We're vacating all of that. We're either reversing it or vacating it. Now you're saying. . . But they released control of it even though it doesn't exist anymore? I'm saying that. . . We've replaced. . . We vacate or we reverse. I'm sorry. We undo it. We put the parties back in the position in which they found themselves beforehand, in which hand this $260 is then covered in favor of Comerica. I'm sorry. I was saying something. Comerica, in my view, released its control over the money not simply and narrowly as a result of the augmentation order. The augmentation order simply allowed the trustee to move the money from this account to this account and distribute it to him. But you told us you want us to get rid of that augmentation order one way or the other. Because eating a dead horse here, in my pinhead mind, it immediately goes back to where it was. It's Comerica. And I'm saying that either. . . There are then two alternative results. The less. . . Forgive me for stumbling over the word. The less comprehensive version is that it goes to that point and then the bankruptcy court is assigned to figure out what to do with it because it's back there. The bankruptcy court is going to say it belongs to Comerica. Goodbye, next case. Excuse me, Ron. But without meaning to play semantics, it doesn't belong to Comerica. It is the estate's money that is encumbered to Comerica. How do you get it away from them if we vacate or reverse? I believe that the status of the case is that Comerica has ceded, if you will. I can't come up with examples. In other words, Comerica has taken a quarter of a million dollars and just tossed it on the table, and you say it's to be used to pay administrative costs not only to the trustees but yours as well. Correct. I'm saying that when Comerica. . . That's what you're saying. Yes, when Comerica agrees it can be used for administrative. . . Once they cut it loose, it's cut loose for everybody. Exactly, and we've made that point. When Comerica releases the money. . . I mean, you're trying to have it both ways with that. Under 726, if we get rid of this order, as you suggested we should do, 726A1, it goes to Comerica. Not necessarily. . . See, not necessarily lock, stock, and barrel, Your Honor, because of the surcharge issues. There are a number of things. . . How are you going to get anything out of that if we do what you ask us to do? Well, my point is that lots of things remain to be done. You're going to get money out of it because there's going to be some money on the table and you've got something to negotiate over. That's correct, and I think, Your Honor, Judge Trock, the more complete response to your question is that for this to be wrong and for us to be correct as appellants here does not require, and we can't know, but as a legal construct it does not require that there be a preexisting answer to exactly how much money. . . That's why I asked you what you want us to hold, because what we hold is going to affect what happens. Of course that's true in all respects. What we say the fundamental wrong here is all of the scenario, if you will, that creates a situation that says the trustee can take money that's loaned into the estate and agree and use it just for his fees. With all due respect, I certainly don't mean to contravene, Your Honor, but the source of that problem is a crossroads between the entitlement to those fees in the first place and what Lazar necessarily and relatively routinely says. The source of the entitlement to be paid anything derives from the bankruptcy code and is of a type of allowance, if you will, under the code. Lazar and the code construct itself says that is one of several, all of which must be treated equally, and there must be a line that the bank cannot say, I'm hijacking this estate and I'm going to tell you that you can pay yourself and no one else. If you just look at it from a global perspective, it's pretty hard to argue that the trustee hijacked the estate. I pull a rabbit out of the hat on this whole project and everybody seems to have gotten paid except you. Actually, no one's been paid except Comerica, as far as that goes. Your last comment was, while I guess we're here with a mercenary flavor to it, that doesn't make it wrong. We have an entitlement, be it mercenary, selfish, however one wants to characterize it. We have an entitlement to be heard and to be treated fairly. The record is not complete as to whether every other type of administrative expense has been paid in full. There's generally been statements made that only Comerica, and in fact Comerica is still short money. So by a natural flow of secured positions, one would infer that lots of other people weren't paid. But that's not what this case is about. This case is about the equal treatment of administrative expenses and a trustee's duty to either turn away from inappropriate gestures or to work for the community. There is no in-between. Could we view this as equitable subordination? Well, that's what Lazar says. And Lazar says you can't do that, certainly not on this record. The trustee has, to the best of my knowledge, denied that that's what happened. We believe that is one way to characterize it, but because there really were no findings, we're sort of stuck at the post-event level. Not only are we post-transaction, but we're sort of post-legal applying labels. That would certainly be one correct label to apply as exactly what happened in Lazar. So your point, among other things, is that our standard review is de novo, because you're saying that this was an illegal error at the bottom of the discretionary decision. That's correct. That's correct. Or if it's discretionary at all, it's within that realm of cases that, say, a misapplication of the law constitutes abuse of discretion because of the construct of the entitlement to fees in the first place and the ranking and treatment of administrative expenses. Well, if Co-America had made that allocation of a quarter of a million dollars, where would you be? Well, I'm sorry, Your Honor. I'm not quite following which aspect of the case you're asking about. Well, at the end, when they put in that augmentation. If they hadn't done that, where would you be? Well, let me think about that for a moment. We would be out. Well, not entirely. This narrow proceeding that's before you would presumably not have occurred or not have occurred yet, okay? Because, and this is illustrative of the fact that things come up and recreate themselves in a bankruptcy environment numerous ways and numerous times. With all due respect, Your Honor, in a sense it's kind of an incomplete hypothetical, as the trial lawyers would say, because we would have to add to that question what eventually happens with the estate. Because at some point there's going to be a final decree and a final accounting and distribution of whatever's on hand, including a reconciliation among equally ranked holders of claims. So your question was unintentionally incomplete in that it doesn't take account of those things. And this same question could well have come up had this event not occurred and the money simply sat where it was. It could have come up, for example. And I keep thinking if Comerica had said no or this event had not occurred, then the money that we're talking about, the 260, would have gone under 726A1 to Comerica. But among other things, Your Honor, we don't know on this record that it would have, quote, gone to Comerica. But we do know that as it sat there, it had a lien on it or over it. Well, ordinarily, doesn't that mean where it's going to go? Not necessarily. There are surcharge issues. And again, you wouldn't see a penny of it. Oh, to the contrary. We certainly would because, well. You can't claim an administrative expense against a secured claim like that, can you? Well, we've now moved into a whole, but I have. That's the point of the secured claim. But the surcharge rights, there's a fairly significant, although somewhat currently muted debate going on in the world, if you will, as to who's entitled to the surcharge proceeds. And there's a distinction, for example, as to whether the evidence of who did what work that constitutes the surcharge, whether that's evidence and the surcharge comes to the trustee as a whole, or, and I think in light of the Henhouse decision from the Supreme Court, it has to go the other way, but the contrary discussion is whether the representatives who did the work, or I should say the elements, if you will, or the constituents that did the work that composed the surcharge, get the money directly. Here, I believe that as a result of Henhouse, which is a point outside this case, the money must come to the estate as a whole and the, and by the way, Your Honor said we would get nothing. I would have to disagree with that because we did work. When one looks at the definition of terms that Comerica and the trustee agreed to as to what the justification for the trustee money is, we fit well within that. I don't remember the exact terms as I stand here, but it clearly was a description of work done to advance the process of the real estate development. And before the trustee took over and the trustee's law firm took over, that's exactly what we were doing. And there is some unspecified but clearly existing component of work that the trustee didn't have to do and the trustee's law firm didn't have to do because we had done some of it. Why don't you claim under that and get your money that way? Because, Your Honor, the trustee, that comes full circle. That is exactly the question and the answer is because only the trustee can make the charge against Comerica. We can't. Can't the bankruptcy court direct it? Well, the bankruptcy court, of course, will address disputes that come before it. The bankruptcy court can't instigate that. That's exactly the root of the problem. The trustee is the only one who can do those things and he did them only for his own benefit. That is exactly the other way of looking at exactly what the problem is. We can't do that. Only the trustee can do that and we're entitled to share. I see that I've gone considerably over. I should take a seat. Well, it's a difficult case. It's a very important policy decision in this case, Your Honor. I can't leave without impressing upon this court the magnitude of the policy decisions that run through this case. Well, one thing you said is this happens all the time. If it happens all the time, are we going to throw a monkey wrench into what happens? I'm sorry. When I said that, what I meant was the circumstance of negotiating either for post-petition money, for sales transactions as you have in Encore or in the bankruptcy judge from Northern California in the Preston Lumber, you have, when I say it happens all the time, you have the scenario presenting itself all the time where there is secured creditors who are either looking to take something that's already in the estate, willing to contribute some new funds to an estate ostensibly for its betterment, usually for their own benefit, but not always. I'm sorry. Go ahead. With the trustee charged singularly with negotiating those terms, and as the judge in Preston Lumber said, the trustee's rights and powers are not for sale. They are not money-making centers to be used for the benefit and sold to the benefit of the secured creditor. They are to be used for the communal good, and if, whether as a ploy or otherwise, if that calls for the trustee to turn away from an inappropriate request or ultimately actually call that bluff perhaps, that's what has to be done, and that's why this court, as far as I know, and I checked it as recently as last night, not only is this the only circuit court, I'm not sure that any district court or appellate panel has actually addressed these merits. This case is going to have very significant ramifications in terms of whether private deals can be made and basically make sub salentio prioritization of the administrative expenses. You keep calling it a private deal, but it ended up going to court, and the court approved it. Of course that's correct. It started as a Chapter 11, right? Correct. And what was your law firm's part in that? We represented the debtor in possession until the debtor in possession was unsealed. Debtor in possession, standard old Chapter 11. Tell me, I'm not exactly sure of my own mind, how did the trustee get involved in the whole thing? Comerica became, Comerica was obviously a central player in the case, being a construction lender at the time. There were the usual variety of alliances and dissonance between the construction lender and the borrower debtor. Ultimately, Comerica ultimately got tired of the situation, to use the vernacular, and prompted the ouster of the debtor in possession appointment of a trustee. I should point out, since Your Honor has asked that question, it's also important to note that the appointment of a trustee was itself a breach of the pre-existing financing arrangements. That's shown, and I have the note, in the original borrowing agreement that they keep sort of blaming us for, the appointment of a trustee was a breach. So the trustee came into the situation where his very existence was a breach of the agreement. And he made, of necessity, he made a new deal, or he negotiated away the breach, whichever version of that one wants to apply. Again, never made clear, perhaps it doesn't matter, but one of those two things necessarily happened. Was the breach to your detriment? Well, the breach would be to the benefit, I suppose. See, the problem, Your Honor, with the detriment language is that it's hard to... Were you happy when Comerica came in and said, we want this thing handed over to a trustee? Well, we were not happy in the sense that our client was on the wrong side of that contention. So one adopts a client's position, and one doesn't ever want to see a client sort of put aside. From a purely selfish standpoint, it was relatively... What are the considerations that a court has to go through when it decides to basically oust the debtor in possession and put a trustee in charge of the whole thing? Well, they're very, very variable. They can be as clear and extreme as fraud and wrongdoing and missing money and inappropriate acts. Case law supports something as potentially soft as creditor fatigue and creditor... Excuse me, very much. Loss of creditor confidence and support for the debtor. Obviously, and that's phrasing, very close to phrasing I know is in the case law. That's obviously a very movable phrase, but that is phrasing that's in the case law, and needless to say, it could be anywhere in between. And there's anything to be taken account of from the politics of a given case to... I mean, everything from perhaps the debtor's age and infirmity, which may or may not be over... Any number of things. Basically, the court has to be convinced in some degree or another that the current situation is not in the best interest... Certainly, that's correct. ...of the effectiveness of the bankruptcy clause. Yes, certainly that's correct. No question that that's correct. Thank you. Okay, thank you. I think we're about all set. Good afternoon, Your Honors. Let me begin with a point that there's absolutely no question in the record that Comerica had a lien against the money, the $250,000, which is at issue, and that had the $250,000 not been dispersed pursuant to the augmentation order, it would have gone back to Comerica. The trustee said this. The court itself, Judge Russell, acknowledged this on the record during the hearings. And, in fact, when pressed, the attorney representing the appellant at that hearing, Ms. Weiss, finally admitted it. You can kind of get a sense today of how hard it is to get the appellant to admit that, but that's the way it is. And the reason is because the financing agreement with Comerica specifically provided that the funds that were provided by Comerica to the trustee to be used in connection with the construction of the condominium project, as well as the proceeds received from the sales of condominiums and going through with the business of the debtor, if you will, Comerica retained a lien on all of those proceeds. Furthermore, Your Honor, although this isn't in the record, but I'm going to say it anyway, because Mr. Weinstein has made the suggestion that Comerica somehow gave up its rights when it allowed these funds to be dispersed to the trustee and the trustee's professionals pursuant to the augmentation order. Subsequent to these proceedings, Comerica actually entered into, I believe it was a stipulation that was filed with the court, where Comerica specifically stated that it was retaining its lien on this $250,000 in the event that the augmentation order were to have been reversed. I don't know that you're... I understand that argument, but the counterargument is once the money enters the estate, the lien on it, if you like, is still subject to the bankruptcy law. And the bankruptcy law prohibits the trustee from making preferences among administrative expenses. So the lender is going to be slightly disappointed because the money is going to go a little bit differently from what he expected and what the lien provides. But the agreement is trumped by bankruptcy law. Now, will you reply to that? Your Honor, I don't believe that it is correct that bankruptcy law, under circumstances in which a secured creditor is entering into a financing agreement or some other agreement with regard to the distribution of its collateral, I do not believe that it is the law that the lender cannot limit the use of its collateral for particular purposes. What case or statute says that? You say you do not believe. I don't believe a lot of stuff either, and it doesn't get me anywhere. Your Honor, the only two statutes of the case. The only two cases that either the appellant or I have ever been able to locate which directly addresses these issues are the two which go in the trustee's favor. That's the Hotel Syracuse case out of the Northern District of New York, a 2002 case, and also the American Resource Act. Look, as far as authority goes, forget it. As far as authority goes, there's no authority controlling us. So we have to decide what's best for bankruptcy law. And you've got to make a winning argument, not based on any precedent, but on common sense. And there's a fairly common sense argument on the other side that if you let trustees make side deals, the priorities of bankruptcy law are going to be distorted. Now, why doesn't that argument make a lot of sense? Your Honor, because when a veteran possession or a trustee comes into bankruptcy and is required to borrow funds from a lender in order to proceed with its business or the business of the estate, the lender is going to limit and restrict the use of its funds. Well, that's right. But the problem is not with the lender but with the trustee. The trustee says, I need this money for administration, but the trustee's got to bear in mind that there are other people in exactly the same position. So if he's going to get the money, he's got to distribute it that way. He can't run off and make a side deal with the lender. Well, let me kind of bring this home to this particular case because there's something in this case which Mr. Weinstein loves to disregard, which bears on the issue which you're asking about. If I understand the question correctly, it's why isn't the trustee coming in and negotiating for the entirety of the administrative body? Why isn't it trying to get money from Comerica, which not only would go to the trustee but which would go to Mr. Weinstein's firm? And the answer, Your Honor, is under Section 506C of the Code, which provides surcharge rights to a trustee. And Mr. Weinstein talked about the trustee had supposedly – it was his duty to come in and exercise these surcharge rights. Your Honors, the debtors represented by Mr. Weinstein waived all surcharge rights before the trustee ever came into the case. When the trustee came into the case, he had no leverage. The trustee had a choice. He could either abandon the property, which would put the property essentially up for foreclosure, all the material, and everybody else for which the case was being administered by the debtor according to the debtor's own pleadings filed with the court. The whole benefit that would have come to all of those constituencies would have never existed. The trustee would have just come in and said, Court, I know you just appointed me lender. I know you're willing to lend money in order for us to proceed and get this condominium project done. City of Hollywood, I know that if we don't get this project done, we're going to have these low-income exclusionary issues get triggered. The trustee could have done that. Against whom were the surcharge rights that the debtor waived? If the surcharge rights existed, they would have been exercised against America. And why would they have been exercised against them? Because a trustee or a debtor in possession, if no trustee has been appointed, may exercise surcharge rights against a secured lien holder to the extent that the trustee or the debtor in possession acts in a manner which benefits that secured lien holder. And what was the consideration for waiving the surcharge rights? The debtor waived those surcharge rights as part of the very first financing agreement as well as the other two, in which essentially it received all of its operating loans from America. Was this in the excerpt from the record? Yes, it was, Your Honor. I would have to look. I'm happy to take a look if you don't mind. I believe I attached in the supplemental excerpts as tab one, if I remember correctly, and I'm not positive about that, an initial motion by the debtor in which it sought approval of that financing arrangement. At the very least, Your Honor, somewhere in the record is a copy of what we call the third stipulation, which was the last stipulation between the debtor and Comerica prior to the trustee's appointment. That stipulation also contained the surcharge rights. Your Honor, I am quite confident that all three stipulations between the debtor and Comerica are in the record because I remember now putting citations to the particular page numbers with the 506C surcharge waivers in our brief. Once it's established, Your Honor, that the funds, the $250,000 at issue in this case, would go back to Comerica, which has been, again, admitted by the appellant, it means that the appellant would not benefit at all from a reversal of the order. And under bankruptcy law, in terms of standing, it's a more narrow standing requirement in bankruptcy appeals than in general Article III appeals. An appellant must show that they have a pecuniary interest in the outcome of an appeal. In other words, they need to show that there's some sort of financial stake in the fight. Here, Your Honor, the record is clear. Judge Russell acknowledged it, and the appellant admitted it, that if the court were to a bankruptcy court, were to have denied the augmentation motion, that the $250,000 would have gone to Comerica. And it's that simple in terms of standing. As a result, we don't believe that the appellant has standing in this matter. I do want to address... By the way, your brief on page 51, going back. One reason that the argument is not relevant is because long before the trustee appointment date, the debtor is the debtor in possession, waived all surcharge rights against Comerica under 506C or otherwise. But I'm looking for... And then ER 0609-670-711-756, is that where we find that? I believe so, yes. In stipulations? Yes, Your Honor. This waiver included any surcharge rights that could have been enforced? Yes, Your Honor. Okay. And the surcharge rights, one of the reasons why that's such a big issue, is because Mr. Weinstein, again today, as well as in the brief, as well as before the district court, likes to cite to the Ben Franklin case. The Ben Franklin case is one which addressed a surcharge under 506C. Now, this is a little bit of a side issue, Judge Trott, but you asked a question about what happens to the funds if there's a 506C surcharge. Cases such as Ben Franklin say that that surcharge is for the benefit of the state as a whole, not necessarily the administrative professional who actually performed the services that led to the surcharge. But the point is that Ben Franklin and other cases like it, including the Hartford underwriters, which the appellant likes to cite, those are 506C surcharge issues. And in those situations, here's kind of how it progresses. The trustee asserts a surcharge against the secured creditor. The court finds that the surcharge is appropriate. The secured creditor is required to give money to the trustee. Under 506C, under those circumstances, those funds are free and clear funds. And as a result, cases such as Ben Franklin say that because those are free and clear funds and aren't subject to liens, that those should be distributed just like other unsecured funds to administrative creditors on a pro rata basis. Lazar, another case that the appellant likes to cite, is a case which dealt with unsecured funds. The only two cases, again, the only two cases... Unsecured funds for Hotel Syracuse and American Resources. They're not authorities in this court. They're just interested. That's correct. So you want to spend your time on the things that are essential, not on just minor diversions. Tell us what's best for the bankruptcy. In general? In this case in particular or in general? In this case in particular. Your Honor, I'm sorry, Your Honor, I'm not following. Well, Judge Newman told you that we want to come up with a decision that's going to be good for bankruptcy law. Correct, Your Honor. All right. And the decision is consistent with the trustee's position in this case. And this is why, Your Honor. We see two different, at least I see, two different types of circumstances in which there is, in essence, kind of an unequal distribution to administrative creditors who would otherwise be entitled to receive unencumbered funds. If the funds were, I'm sorry, funds if they were encumbered. Number one, Your Honor... Funds if they were encumbered. If they were unencumbered. Unencumbered. Unencumbered. All right. So, scenario number one is where a debtor provides its attorney prior to filing for bankruptcy with a retainer. Okay. There's a BAP case which was decided last year in this circuit called Dick Sepik where the court addressed this issue and decided that if a Chapter 11 debtor's attorney has a security retainer, that those funds do not belong to the estate. And the reason why that's important is because attorneys representing debtors want to have some security coming into a case. In fact, Your Honor, in this particular case, the Weinstein firm came into the case with a retainer. Okay. Trustees don't have that benefit. The trustee comes in in the middle of the case. We discussed this a little bit in our brief. I believe it was Judge Trott who asked why it was that there was a conversion in this case. And among other things, it was because the debtor simply ignored and refused to abide by its obligations to Comerica under the financing agreement. Various other creditors had already requested that the case be converted. There was some resistance to that until Comerica said, you know what? I've had enough. The debtor is not following through with what it's supposed to do under the financing agreement. He said, court, get a trustee in here so that this project can go forward and so that the, for example, the so-called fountain property, the one that was going to provide low-income housing in the city of Hollywood, so that that can get completed. And by completing that, then it releases the obligation to have low-income housing. It's the Desmond Project, which was the primary project. Comerica at some point got fed up with the debtor. The court brought in the trustee. What's the difference between the trustee and the debtor's attorneys? Debtor's attorneys had a chance to get a retainer before they came into the case. The trustee doesn't. There was no free and clear funds. The trustee came in and the trustee was willing to proceed, but only if there was some assurance that the trustee would be paid. Are you saying the retainer was paid to the Weinstein firm? Absolutely. The Weinstein firm received a prepetition retainer in this case. I believe at the time it was provided it was only about $50,000, but it doesn't matter. The amount doesn't matter. The point is the Weinstein firm took advantage of its opportunity to have a retainer. A trustee who comes in in the middle of the case after a debtor has committed fraud or whether the debtor just hasn't been filing the appropriate paperwork, a trustee doesn't have that opportunity. Instead, particularly where the debtor has already waived surcharge rights, the trustee is able to only say, you know what, I'm willing to proceed, but only if I have some protection. And let there be no question here. The trustee is underwater in this case. My firm is underwater in this case. It's not like we've been paid in full either. But the trustee was willing to proceed after having been put into place by the court, was willing to proceed with the completion of the project. The trustee's job was to oversee the completion of these construction projects. Absolutely, that's correct. The trustee's job generally is to perform the operations of the debtor. In this particular case, the debtor existed for the purpose of completing these construction projects. A second circumstance, I'd mentioned the retainer. A second circumstance which I think is actually quite common and it's one of the reasons why I'm surprised. Banks put up how much extra money they put in, $20 million or what was it? I believe that when the trustee came in, it was about another $7 or $8. But I don't remember the numbers for sure. I think that Mr. Weinstein was talking about in the overall scheme of things how much Comerica put in. If I remember correctly, the trustee secured an additional $7 or $8 million. The second circumstance, Your Honor, when we're talking about policy again, it is absolutely not uncommon when a debtor in possession particularly comes into a case where there are no free and clear funds and it's required to borrow from... There are no what funds? No free and clear funds and it's required to borrow from a lender. A trustee will often go to that lender to try to get post-petition financing, such as what the Weinstein firm did in this case. In a Chapter 11 case where you have a committee, the committee's professionals are also entitled to be paid as administrative claimants. And oftentimes, the debtor will negotiate a deal with the lender, which provides, say, I'm making these numbers up obviously, it's case by case, $100,000 for the debtor, $25,000 for the committee. It's almost like throwing a bone to the committee. But the committee is willing to do it because it provides them some source of payment in cases where they otherwise wouldn't. If you agree with Mr. Weinstein and you publish an opinion in this case which says that a lender is unable to dictate where funds go, that is eviscerated. And I believe that if you were to do that, that the debtors who come in would essentially have... the debtors' attorneys would either require more money from lenders, which may cause lenders to balk, or you'd have situations where committees are essentially eating into the funds that a debtors' council would otherwise be able to negotiate for itself. And you're under that committee-debtor situation. If you want to see an example of that, that is the American Resources case, where the secured creditor consented to pay a certain amount of fees for the trustee, in that case it was a trustee, not a debtor, but a trustee in the trustees' council and a smaller amount for the committee. That, I believe, is very common, but it's a way for the committee to be able to have some assurance of payment, but it is technically an unequal distribution to administrative creditors. If those funds were unencumbered, we might have a problem with that. But where the funds are subject to a lien, we don't. And that's the proper policy, and that's... Precisely how do you distinguish LAZAR? How would we handle LAZAR if we were to agree with you? LAZAR is unencumbered funds. Fair and simple. Yes. And, Your Honor, I don't think that there's really any question here on kind of the third issue that was raised in the opening brief with regard to Mr. Roelke. I'm more than willing to answer any questions about that, but it's absolutely clear and the district court was absolutely correct in determining that the augmentation order has absolutely no bearing on Mr. Roelke since none of the funds were going to be paid to him. I think you're right. And so unless the court has any other questions, I think the court's fine. Thank you. Well, you know, we'll give you another minute. I have just a couple of, I think, cogent responsive points. Number one, with respect to the carve-out in the retainer, I have at Bates page 166 of the supplemental excerpts, and the next page is important because that points out the first page that I mentioned, 166, states that the $50,000 carve-out that our opponent mentioned, that was for the payment of allowed fees and expenses to any professionals. We made a point of addressing the fact that everything had to be treated equally. And on the next page of the excerpts is where it's pointed out the appointment of a trustee alone is a breach of that agreement. So that means when the trustee came in, you keep hearing the argument that this was not a, quote, surcharge, but they don't tell you what it was. It was either some kind of an agreement. The case is made clear that the only source, the only conceivable source for a trustee or a debtor in possession to negotiate for money for the estate, which this was an estate function, is under 506C. So they keep saying it's not at 506C because 506C was waived, but that agreement was breached and the trustee came in and fixed everything. So he de facto surcharged the bank. That's the only way to possibly even explain the circumstance. Otherwise, he was entirely paid on a private deal. That's the only two ways to possibly label what they did. So, and I agree, it says the waiver was negotiated by WWO as the debtor's council and appeared in each of three court-approved financing snippets. Correct. All of which were breached by the appointment of a trustee, all of which meaning that everything was up for negotiation when the trustee came in. That's my point. That is correct. But the answer to that is, so what? See, they keep making that argument, Your Honor, but it's so what? So the carve-out was negotiated, then either somehow this didn't happen, obviously it did. It has to have some kind of label. So it was a reparatory surcharge. It had to have some kind of label unless it was paid on the side. Now, I need to go back, and bear with me. This notion that it would, quote, go to Comerica is a bit too simplistic. And I think, Judge Noonan, you hit this on the head, although I'm not sure if I want to attribute this to you. But the question really becomes, and the illustration becomes, if when, and Your Honor, you asked what would happen if you vacate. And what I would say, and to illustrate the answer, if this is vacated and undone, rather than just assuming that, quote, the money goes to Comerica, someone, whether it be me, Mr. Gill, Mr. Gill's successor, or for that matter the court, should say, Comerica, X number of years ago, you let go of this money. Now, why do you even care now whether it all goes to Mr. Gill or to Mr. Weinstein in some yet-to-be-determined proportion? And this illustrates, on the one hand, that we shouldn't move into speculation and assumptions about what's next. But conversely, if we're going to do that, the next question is, why, Comerica, are you Mr. Gill's individual protector? And there is no answer for that. The only possible, there's no acceptable answer. The only possible answer is, we needed him so that we would have 362 protections against mechanics liens, so that we would have super priority powers that the Bankruptcy Code gave us under 364, so we needed to have Gill in the story. So we wanted to pay him to keep him in the story. So that's why we're his protector. Well, why would they want to keep him in the story? Because of all the various protections. Bankruptcy has this general... Why would they want to keep him in the story? To complete these projects? Well, not exactly. Because, Your Honor, let's remember... They want to keep him in there to complete these projects. Well, that's a little bit... I'm sorry. Well, that's what I would think. They want him in there to complete the projects. And I don't know what the timing was and all that, but prices are going up. We get the projects completed. We'll get our money out of it. And then there might be some left over, you know, after the banks are paid off and they get their interest and all that. But consider... That's why I would think they'd want Gill to stay in there, so Gill could complete the project. And the District Court identified that as one of the reasons... Right, but consider why that's just three-quarters of the story. Mr. Gill, or any trustee in bankruptcy, is no professional real estate developer. They didn't need him because of his real estate expertise on just how to lay out a kitchen. So get rid of the trustee? No, the point is... Well, yes, because if all they wanted to do was finish the real estate development, they could have done that at least as well outside of bankruptcy. You tell us that the sky is going to fall in bankruptcy law if we disagree with you in this case. That's what I hear you saying. Who was the bankruptcy judge that approved the augmentation order? Barry Russell. You know, I mean, he's no dummy. Your Honor, this is... You're telling us he approved something that brings bankruptcy law as we know it to the end? Well, number one, he doesn't have the same... His actions... Exactly. Russell's... I mean, he's one of the acknowledged experts in bankruptcy law. He's a law professor. It's not a question of him being dumb or any kind of... But, I mean, you tell us the sky is going to fall,  Larry Lew and Curley are the three students. Of course not. Barry Russell is... Of course not, because... Not about to bring down the whole system. Of course not. But then again, among other things, any given bankruptcy judge, whether he's esteemed or otherwise, doesn't have nearly the same kind of global review of either the circumstance or the effect of his rulings. So, he was dealing, we believe, erroneously, and just because he's esteemed and just because he's a professor, certainly doesn't... He's thinking about it anyway. I'm sorry? He's thinking about it. Well, of course... He knows that the decision is going to have an effect beyond his case. Well, Your Honor, I guess I'm not exactly sure that that's correct, but... Well, he's a law professor. He's teaching all this stuff to students at Loyola. True enough, but his decision... Maybe I'm on the wrong track here, because did you ever hear of equity funding? I did. I have. You did. Something tells me it was perhaps you. I don't remember who... Well, you see, fame is ethereal. It was me, and I relied on a trustee. Of course. Who pulled it all through. Of course. Who was ingenious. Of course. Yeah. But that doesn't make this right. That doesn't make this right. I'm just saying. I mean, that's the way I look upon the role of a trustee. But that doesn't... I'll ask you another question that's stimulated by my colleagues. You think this is so bad for bankruptcy law. You did have two avenues of appeal. You didn't take it to the BAP, did you? This process did not go to the BAP. That's correct. And you had that option, didn't you? Yes. And they were the real experts. We're not as much experts as they are. Well, those are true statements. Is the question why we didn't do that? Yeah. Well, there's a history. Your Honor, you put your finger on kind of an interesting visceral, an interesting dynamic that's almost confined to the Ninth Circuit. It's a matter of some debate. There's nothing but sort of visceral judgment on the part of counsel as to how one makes those elections. And other than giving you that I made that visceral election here, taking into account some history and some visceral judgments, there is no hard answer to that. That confronts lawyers almost exclusively in the Ninth Circuit, continuously since 1979. I've done a lot of speaking about bankruptcy appellate structures and how different it is in other circuits and all of that. But there's no hard answer to that, Your Honor. It's just part of a lawyer's judgment. What happened in the 19th? What do you say? I'm saying the Ninth Circuit is the only circuit that's had a bankruptcy appellate panel. Jim Browning was behind it. I'm sorry? Never mind. Jim Browning was behind it. I believe Judge Browning is, in fact, correct. I'm saying the Ninth Circuit is the only circuit that's had a bankruptcy appellate panel continuously since the bankruptcy. And that was endorsed by people like George Treaster and all the small and great bankruptcy minds and those who worked on drafting the new bankruptcy code. What's the guy's name again? He's here with his brother who practices bankruptcy law as well. I'll think of his name in a minute. Two brothers. I'm still with Treaster's old firm. Oh, you might be speaking of the Pachulskis. Yeah, Pachulski, yeah. Okay. Anyway, I want to leave you with, because there was discussion with my colleague from the court. I did take a bankruptcy course at law school. I'm sorry? I took a course in bankruptcy at law school. That was probably 15 or 20 years ago, Your Honor. About 100. I must leave you with some language from the bankruptcy court. And, of course, it's not controlling either. But these are reasoned opinions. And the court in Philadelphia said there were limits to the use of 363, which is immediately parallel to what we have here, 364. It's clear that Chapter 11 liquidations, which is what this is, are subject to proscriptions of Chapter 11 concerning the filing of a plan. Secured creditors understand the necessity of making some distribution available to other creditors as the price of a court-approved process. That's the answer, as concise as it can be, from an equally renowned bankruptcy source as to why this is not appropriate, inappropriate. And the fact that Judge Russell is in his own, well, and for his 30 years, I believe, that he's on the bench as respected and as esteemed as they come, I submit to you, Your Honor, that that alone, and that can have, with all due respect to Judge Russell, very little impact on your analysis as to why it's here. You're right. The name of the bankruptcy judge is, you're telling us it's going to bring the whole system together. I'm not suggesting this is an easy question. I am suggesting that one drills down into it. What you're suggesting, I think, is that it's like the trickle-down theory, that the trustee gets the money and the other people ought to get some money so that the whole system can work harmoniously. Correct. Is that what you're saying? Yes. But the equally situated people are treated equally is a fundamental premise, and the final... That isn't what that judge said. Well, in a certain, no, that was not the point. He said, yeah, there's this money out there, and the trustee, you shouldn't take it all. Maybe you aren't entitled to it, but don't take it all. Leave some for other people so we can have a harmonious family here, because, you know, you might not be the trustee in the next place. Yes, this was the point about why does a secured lender want to have the benefits and processes, or what's the impact of a secured lender wanting to have the benefits and processes of the bankruptcy case, which is sometimes casually thought of as against the secured creditor, but particularly in an operating case, the secured creditor, particularly a construction lender, is usually as much or more benefited as everybody else. So this point was that there are motivations, and when secured lenders come to trustees and want to make those kind of deals, this court's point was secured lenders know the price of a court-approved deal, and the price of a court-approved deal is leaving something for unsecured, and the Bankruptcy Code structure says for money to reach unsecured, everybody in between has to be paid to, not someone who's in on the negotiations make a separate deal. So the last point, and I've gone way over, but I appreciate this court's indulgence. But mostly, I think I've been answering, and I hope I've been answering forthrightly. The comments that were made about what we negotiated, and totally external remarks about fee waivers and fee agreements and all of this, those are all consensual deals. Those are consensual deals, and the fact that someone in a particular case, and that's what happened in American Resources. The creditors' committee council agreed to the disparate treatment, and then when it came home to roost, much after the fact, came in and complained. That's why that case is not persuasive. There's one case that says what they wanted to say. But consensual deals are not what we're talking about. We're talking about the trustee using the trustee's and the Bankruptcy Code powers to make a deal that was eccentric, if you will, to himself. That's what this case is about, not about consensual agreements, not about people accepting themselves from the priority scheme. Those are all things, and Lazar is not about unencumbered funds. That word is not in there anywhere. No, but it's a fact. Well, it appears to be a fact, but the reason that that's a nondistinct distinction is that there's nothing in Lazar that talks about actual distributions. It is strictly about interrelational rights, and in fact, it appears one can infer from the case because by the time the case was published, the case had been converted to Chapter 7. Lazar is about the interrelationship of the Chapter 11 creditors, and so the inference is strong that while it's probably about unencumbered funds, The rule is live and let live, right? Agreed. Okay, that's all there is. In Lazar, because it was converted, the implication at least is that payments are not to be made yet, and the decision was made not because of a source for payment, but because of the interrelational rights. That's what the case is strictly about. It says nothing about unencumbered funds, even assuming that that's sub silentio. It says nothing about actual distributions on those rights. It's just about reordering rights. That's all it's about, and that's really all this case is about. Unencumbered funds adds a pretty significant factor to the equation. I submit it doesn't because otherwise you say if one believes that, Your Honor, then every time the case appears to be encumbered or sometimes you know that it's encumbered, then you're allowing the secured creditor to reorder the bankruptcy. Suppose the secured creditor says, We're only going to lend money to this important project if you hire such and such a lawyer. And such and such a lawyer has an arguable conflict, or for that matter, doesn't get along with the debtor. There are limits. They cannot be allowed to hijack the estate. Have you had a problem getting along with the Gill law firm? I certainly don't have a problem with them, Your Honor. As a matter of fact, there was a time where I was affiliated with that law firm. So I've known Mr. Gill all of my legal career, which is perhaps as long as many of the people in this room. This is not about personal relationships. This is not about the separate esteem of a bankruptcy court or the separate regard that the industry has for Mr. Gill. This is about this case and what happened here. It's about the practical operation of the system, right? Absolutely. And, yes, the practical, Your Honor, but also the philosophical and the analytic operations. Yes, that's correct. I understand all that. All right. Thanks a lot. Thank you. All right.
judges: Pregerson, Noonan, Trott